D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

BARRY KAMINSKY

                      Plaintiff,

    -against-

NATIONAL AERONAUTICS AND SPACE
ADMINISTRATION

                      Defendant.

------------------------------------------------------------------ X

08-CV-3313(ARR)(LB)

NOT FOR PRINT OR
ELECTRONIC
PUBLICATION

OPINION AND ORDER

ROSS, United States District Judge:

Plaintiff Barry Kaminsky, proceeding pro se, brought this action to compel defendant National Aeronautics and Space Administration ("NASA") to comply with his two requests for records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Defendant moves for summary judgment, arguing that it conducted full and adequate searches for documents responsive to plaintiff's FOIA requests and disclosed all documents in existence requested by plaintiff. For the reasons discussed below, the court grants defendant's motion and dismisses the complaint.

## BACKGROUND

A.   <u>Plaintiff's First FOIA Request</u>

The first FOIA request at issue sought copies of the following four documents from NASA:

[1] The final assessment report regarding reentry of the International Space Station's Early Ammonia Servicer (EAS) into the Earth's atmosphere.

1

[2] Output from debris assessment software or any document that specifically states the odds of human casualties from reentry of the EAS. (Only necessary if the odds of human casualties aren't included in the assessment report requested above).

[3] The noncompliance report regarding reentry of the EAS, including the "cost analysis or requirements analysis that documents the impact of full compliance and any unique risks of noncompliance . . ." (Requirement 30894).

[4] The ISS Jettison Policy.

(Luna Decl. Ex. A.)

By letter dated August 27, 2007, plaintiff mailed this request to the FOIA Office at NASA's headquarters in Washington, D.C. The request was transferred to the Johnson Space Center's FOIA Office on February 7, 2008, where it was assigned JSC FOIA Number 08-060. (Luna Decl. ¶ 9.) On that date, Stella Luna, FOIA Public Liaison Officer for the FOIA Requester Service Center at NASA's Johnson Space Center, determined that the request was related to the International Space Station ("ISS") and orbital debris, and therefore routed the request to a FOIA facilitator at the ISS FOIA Program Office.[1] (Luna Decl. ¶¶ 6, 11.) Once the request was received by the ISS FOIA Program Office, "[a]n individual within the ISS Program Office, who had worked on a project relevant to the requested document was identified as the most appropriate person to handle searches for documents responsive to plaintiff's first FOIA request. She worked with a specialist in the office to collect data in order to satisfy all of plaintiff's inquiries, and was responsible for initially deciding which documents were most responsive to plaintiff's inquiries." (Luna Decl. ¶ 12.) All of the responsive documents were located in the

---

[1] The Johnson Space Center's FOIA Office typically handles inquiries regarding the manned space program, including the International Space Station and the Orion program, and space and life sciences, including orbital debris research. (Luna Decl. ¶ 4.)

ISS External Integration Office. (Luna Decl. ¶ 5.) "After all documents that appeared to be responsive to plaintiff's first FOIA request were captured by this initial search, a team of experts from the ISS Program Office examined the documents to make a determination whether the documents satisfied plaintiff's first FOIA request." (Luna Decl. ¶¶ 12-13.) Following this review, Luna was provided the responsive documentation, and she mailed an official initial determination letter with responsive documents to plaintiff on March 14, 2008. (Luna Decl. ¶ 14; Luna Decl. Ex. B.)

1. Item One: "The final assessment report regarding reentry of the International Space Station's Early Ammonia Servicer (EAS) into the Earth's atmosphere."

No responsive documents were located by the ISS Program Office experts with respect to the first item requested by plaintiff. (Luna Decl. ¶ 14.) The March 14, 2008 initial determination letter stated that "final entry has not occurred and there is currently not a plan to produce a report upon re-entry." (Luna Decl. Ex. B.)

On March 31, 2008 plaintiff appealed NASA's initial determination, arguing that two existing NASA safety standards required the completion of a final assessment report regarding reentry of debris from the ISS and therefore such a report must exist. (See Luna Decl. Ex. C.) Following the receipt of plaintiff's administrative appeal, Johnson Space Center's FOIA Office was asked to conduct follow-up searches. (Luna Decl. ¶ 18.) On May 23, 2008, Luna contacted the Chief Scientist for Orbital Debris in the Astromaterials Research and Exploration Sciences Office in search of documents responsive to plaintiff's request for the final assessment report. (Luna Decl. ¶ 19.) The Chief Scientist for Orbital Debris informed Luna that NASA's Orbital Debris Program Office does not produce formal reports on each of their risk assessments for the

3

ISS and the principal policy document relating to such risk assessments is the ISS Jettison Policy, which, as described below, was disclosed to plaintiff with the initial determination letter. (Luna Decl. ¶ 20.) The Chief Scientist explained to Luna that "the safety standard the plaintiff had cited was not applicable to the ISS because of the time the ISS was developed." (Luna Decl. ¶ 20.)

The Chief Scientist located a potentially responsive Excel spreadsheet (referred to as "EAS Reentry Assessment, Final (31 May 2007)"), which was disclosed to plaintiff on October 15, 2008 as part of NASA's final determination on plaintiff's appeal. (Luna Decl. ¶ 20; Luna Decl. Ex. D.) The Excel spreadsheet summarizes the specific International Space Station components that were likely to survive reentry following jettison, and which might pose a potential threat to people on earth. (Luna Decl. ¶ 20.) The spreadsheet included the final human casualty risk assessment, which, as described below, was disclosed to plaintiff with the initial determination letter. (Luna Decl. ¶ 20.)

2. Item Two: "Output from debris assessment software or any document that specifically states the odds of human casualties from reentry of the EAS."

The ISS Program Office experts performed searches responsive to plaintiff's request and found a presentation that contained the odds of human casualties from reentry. (Luna Decl. ¶ 16.) The ISS Program Office experts reviewed the presentation and determined that it satisfied item two of plaintiff's FOIA request. (Luna Decl. ¶ 16.) This presentation document was released to plaintiff in the March 14, 2008 initial determination mailing. (Luna Decl. ¶ 16.)

3. Item Three: "The noncompliance report regarding reentry of the EAS"

4

The ISS Program Office experts located a "potentially responsive document" to the third item of plaintiff's request. (Luna Decl. ¶ 17.) The experts initially determined that the document was not publicly available and withheld its release. (Luna Decl. ¶ 17.) The March 14, 2008 initial determination letter stated, "[t]he requested information is a controlled item under the International Traffic in Arms Regulations (ITAR) and controlled for export pursuant to Part 121 of the ITAR, The United States Munitions List as it is classified as Category XV(f) 'Technical Data,' and is not suitable for release to the general public." (Luna Decl. Ex. B.)

On March 31, 2008 plaintiff appealed NASA's initial determination to withhold the noncompliance report. (Luna Decl. Ex. C.) NASA reviewed its decision to withhold the responsive document entitled "ISS Safety Noncompliance Report: Collision Avoidance During Early Ammonia Servicer (EAS) and Video Stanchion Support Assembly (VSSA) Flight Support Equipment (FSE) Jettison." (Luna Decl. Ex. D.) This document was released to plaintiff on October 15, 2008 as part of NASA's final determination on plaintiff's appeal, after experts in the Office of the NASA Export Control Administrator determined that it could use authority in the International Traffic in Arms Regulations and Export Administration Regulations to release the information into the public domain. (Luna Decl. Ex. D.)

In the context of this federal court action, on November 25, 2008, plaintiff expressed his dissatisfaction with the noncompliance report released, alleging that it "covers issues regarding EAS re-contact with the space station but I had requested a[ noncomplaince report] regarding EAS re-entry into the Earth's atmosphere." (Pl. Answer to Motion to Dismiss, Dkt. No. 11.) Based on material in the noncompliance report released to him, plaintiff suggested that a "separate waiver" drafted by NASA relating to the risks of human injury from the reentry of ISS

debris from space should have been disclosed to him. (Pl. Answer to Motion to Dismiss, Dkt. No. 11.) On January 26, 2009, three additional documents were released to plaintiff by the Office of the U.S. Attorney, constituting the full waiver package regarding the risk of reentry of ISS debris. (Luna Decl. ¶ 23; Luna Decl. Ex. E.)

   4.   Item Four: "The ISS Jettison Policy"

The ISS Program Office experts found a document containing the ISS Jettison Policy, which was examined by experts and determined to satisfy item four of plaintiff's FOIA request. (Luna Decl. ¶ 16.) The responsive document was released to plaintiff in the March 14, 2008 initial mailing. (Luna Decl. ¶ 16.)

B.   Plaintiff's Second FOIA Request

The second FOIA request at issue sought "a list of all Core, Above Core, and Triage 1 software applications, with direct indication of the function and OS dependencies of each. . . . The software list should be in as complete and concise a form as is available, and include necessary explanatory information". (Thompson Decl. Ex. A.) The terms "core" and "above core" are terms of art used to distinguish between levels of software, adopted and employed by Lockheed Martin Corp., NASA's outside contractor for maintaining its desktop computing and communications systems.

Plaintiff mailed the request to NASA headquarters on February 26, 2008. Upon receipt of the request, the FOIA Public Liaison Specialist in NASA Headquarters determined that the request sought documents regarding NASA's information technology systems maintained within the Office of the Chief Information Officer ("CIO") and forwarded the request to the CIO FOIA coordinator. (Thompson Decl. ¶ 6.) On March 14, 2008, the CIO FOIA coordinator forwarded

plaintiff's second request to NASA's Information Technology and Communications Division ("ITCD"), a division within NASA Headquarters Operations Office. (Thompson Decl. ¶ 10.) Despite the transfer, CIO and ITCD worked together to answer plaintiff's request. (See Thompson Decl. ¶¶ 10-12.)

To respond to plaintiff's request, "NASA Headquarters' CIO convened its internal staff management team of information technology contractors, including ODIN contractors [contractors from Lockheed Martin Corp.], and the System/Operations & Engineering Branch, a subdivision within CIO to determine the appropriate disclosures." (Thompson Decl. ¶ 11.) CIO, in conjunction with ITCD, identified two documents responsive to plaintiff's request: (1) NASA Technical Standard 2804K, "Minimum Interoperability Software Suite," and (2) "DRD 12 Software & Hardware Baseline Suite". (Thompson Decl. ¶ 12.) On November 10, 2008, NASA issued plaintiff an official initial determination letter, disclosing both documents. (Thompson Decl. Ex. B.) The first document was provided as a reference to assist in the understanding of how the hardware and software baseline suite was derived and the second document identified the actual core, above core, and triage 3 applications. (Thompson Decl. ¶ 13.)

According to the declaration of NASA's Deputy Director and Chief Information Officer, Victor Thompson, plaintiff's request for "Triage 1" software was interpreted as a typographical error because there is no Triage 1 reference or definition that NASA assigns to its hardware or software baseline suites. (Thompson Decl. ¶ 13 n.1.) NASA therefore interpreted plaintiff's references to Triage 1 as references to Triage 3, a definition used by NASA. (Thompson Decl. ¶ 13 n.1.) Plaintiff contends that NASA has used Triage 1 software applications. (Pl.'s Rule 56.2 Stmt. ¶ 4.) Notwithstanding this disagreement, in a January 9, 2009 e-mail to Assistant U.S.

Attorney David Eskew during the course of this litigation, plaintiff wrote: "To simplify things, I'm withdrawing my request for a list of Triage 1 software." (Eskew Decl. Ex. A.)

In the current action, plaintiff does not dispute that he received the documents that defendant claims were disclosed. However, plaintiff maintains that he has not been provided "all responsive documents" with respect to his first FOIA request. (Pl. Rule 56.2 Stmt. ¶ 20.) Specifically, plaintiff claims that, with regard to the first item requested, the final assessment report, NASA has not adequately described its search for a more responsive document than the Excel spreadsheet disclosed. (Pl. Rule 56.2 Stmt. ¶ 30.) He also claims that he has never received the final assessment report requested. (Pl. Mem. Opp. Summ. J. at 1.) Plaintiff claims, with regard to the third item requested, the noncompliance report, that "I wasn't sure the waiver was an appropriate substitute for something explicitly titled *Noncompliance Report* . . . I settled for the waiver after being asked by the court twice whether I'd accept it. . . . The full waiver package that I received regarding re-entry of the EAS (a component of the International Space Station) may be considered responsive to my request for a noncompliance report . . . , though I'd still be interested in seeing an adequate description of NASA's search for it since the title of the waiver indicates it's an 'INTERIM' waiver." (Pl. Rule 56.2 Stmt. ¶¶ 32-33.) (capitalization in original).

## DISCUSSION

A.  <u>FOIA Standards</u>

Congress enacted FOIA "to promote honest and open government and to assure the existence of an informed citizenry to hold the governors accountable to the governed." <u>Grand Cent. P'ship, Inc. v. Cuomo</u>, 166 F.3d 473, 478 (2d Cir. 1999) (internal quotation marks

omitted). In so doing, it "intended to advance 'a general philosophy of full agency disclosure,'" id. (quoting FLRA v. U.S. Dep't of Veterans Affairs, 958 F.2d 503, 508 (2d Cir. 1992)), and, as a result, FOIA "adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies." Halpern v. FBI, 181 F.3d 279, 286 (2d Cir. 1999) (citing FLRA, 958 F.2d at 508).

When responding to a FOIA request, a federal agency must (1) conduct an adequate search using reasonable efforts, (2) provide the information requested, unless it falls within a FOIA exemption, and (3) provide any information that can reasonably be segregated from the exempt information. See 5 U.S.C. § 552(a)(3), (b). FOIA generally requires complete disclosure of requested agency information unless the information falls into one of FOIA's nine clearly delineated exemptions. See 5 U.S.C. § 552(b); Dep't of Air Force v. Rose, 425 U.S. 352, 360-61 (1976) (discussing the history and purpose of the FOIA and the structure of FOIA exemptions).

Summary judgment is the preferred procedure for resolving FOIA disputes. See Amnesty Int'l USA v. CIA, No. 07 Civ. 5435(LAP), 2008 WL 2519908, at *8 (S.D.N.Y. June 19, 2008). As with all motions for summary judgment, summary judgment in a FOIA action should be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). On a motion for summary judgment, "the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994). A search is considered adequate if it was reasonably calculated to uncover all relevant documents. See Garcia v. U.S. Dep't of Justice, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002) (citing Weisberg v.

Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984)). Reasonableness does not demand perfection, and a reasonable search need not uncover every document in existence. Grand Cent. P'ship, Inc., 166 F.3d at 489 ("[w]hen a plaintiff questions the adequacy of the search an agency made in order to satisfy its FOIA request, the factual question it raises is whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant."). The agency is not expected to take extraordinary measures to find the requested documents. Garcia, 181 F. Supp. 2d at 368.

The defending agency's burden to show it conducted an adequate search may be satisfied by submitting affidavits or declarations "indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption." Carney, 19 F.3d at 812.[2] Affidavits submitted by an agency are presumed to be made in good faith. Id. Once the defending agency satisfies its burden of showing that it conducted an adequate search, the burden shifts to the plaintiff to make a showing of bad faith sufficient to impugn the agency's showing. See Carney, 19 F.3d at 812. The agency's presumption of good faith "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted). Speculation that other documents exist, without more, "does not undermine the finding that the agency conducted a reasonable search." SafeCard Servs., Inc., 926 F.2d at 1201.

B.  Analysis

---

[2] "An affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56(e); there is no need for the agency to supply affidavits from each individual who participated in the actual search." Carney, 19 F.3d at 814.

In the instant case, the papers before the court suggest that plaintiff no longer contests the adequacy of NASA's response to its second FOIA request, since plaintiff withdrew his claim for Triage 1 software, and plaintiff acknowledges that he received information about Triage 3 software. Additionally, the papers suggest that with regard to plaintiff's first FOIA request, plaintiff only contests the adequacy of the searches for items one and three, the final assessment report regarding re-entry and the noncompliance report. Plaintiff argues that defendant's declarations are insufficient to establish the adequacy of the searches because the declarations do not identify the databases searched.

NASA has described its document searches in sufficient detail for the court to determine their adequacy. The affidavit of Stella Luna indicates that NASA's search for documents responsive to plaintiff's first FOIA request was "reasonably calculated to discover the requested documents." see Grand Cent. P'ship, 166 F.3d at 489. NASA routed the request to the Johnson Space Center, which handles requests related to the International Space Station, and once at the JSC FOIA Office, the request was routed to the ISS Program Office. According to Luna's declaration, a subject matter expert who had worked on a project relevant to the requested documents worked with a specialist to collect data to satisfy plaintiff's inquiries. (See Luna Decl. ¶ 12.) Following the initial searches by the subject matter expert and specialist, a team of experts from the ISS Program Office examined the documents to determine whether they satisfied plaintiff's FOIA request. (Luna Decl. ¶ 13.) All documents initially disclosed to plaintiff were found in the ISS External Integration Office. (Luna Decl. ¶ 6.) After plaintiff filed his initial appeal, Luna enlisted the assistance of the Chief Scientist for Orbital Debris in the Astromaterials Research and Exploration Sciences Office, who informed her that NASA had not

produced a formal final assessment report, but nevertheless found an Excel spreadsheet containing the data requested by plaintiff which could be disclosed. (Luna Decl. ¶¶ 19-20.)

Luna's declaration establishes that in the course of responding to plaintiff's first FOIA request, at least five subject matter experts, including the Chief Scientist for Orbital Debris, a high level official at NASA, conducted document searches. Her declaration provides information as to who – experts in particular offices – searched for the records and the methods used. There is no requirement for an agency to disclose the identity and background of the actual persons who processed the FOIA request. See LaBella v. FBI, No. 07-CV-2330, 2008 WL 2001901, at *8 (E.D.N.Y. May 8, 2008). Furthermore, the declaration explains why the documents plaintiff requested in his first FOIA request would be found at the Johnson Space Center, which handles inquiries regarding the manned space program, including the International Space Station and orbital debris research. The declarations "show that the agency made a good faith effort to search for the requested documents, using methods 'reasonably calculated' to produce documents responsive to the FOIA request." See Garcia, 181 F. Supp. 2d at 366 (citing Weisberg, 745 F.2d at 1485).

Plaintiff claims, as he did in his appeal to NASA, that the final assessment report he requested must exist because NASA Safety Standard 1740.14 (Guidelines and Assessment Procedures for Limiting Orbital Debris), chapter 2.2 provides that "[t]wo assessment reports should be completed. The first is prepared at PDR [preliminary design review] and the second 45 days prior to CDR [critical design review] . . . The CDR assessment should identify, assess, and resolve all debris issues in detail," and NASA Safety Standard 1740.14, chapter 8 provides that "[t]wo stand-alone debris assessment reports should be submitted during program or project

12

development." (See Luna Decl. Ex. C.; Pl. Mem. Opp. Summ. J. at 1.) According to Luna's declaration, NASA's Chief Scientist for Orbital Debris stated that NASA does not produce formal reports on each of their risk assessments for the International Space Station and NASA Safety Standard 1740.14, cited by plaintiff, is "not applicable to the ISS because of the time the ISS was developed." (Luna Decl ¶ 20.) Consequently, any claim by plaintiff that additional responsive documents exist, such as a final assessment report, are purely speculative and fail to rebut the presumption of good faith accorded to NASA. See Carney, 19 F.3d at 812; SafeCard Servs., Inc., 926 F.2d at 1200-01. Finally, the court emphasizes that "a search for responsive documents need not, and indeed could not be perfect." Lawyers Comm. for Human Rights v. INS, 721 F. Supp. 552, 566 (S.D.N.Y. 1989). A search is reasonable and adequate even if "it fails to produce all relevant material." Meeropol v. Meese, 790 F.2d 942, 953 (D.C. Cir. 1986). Luna's declaration is sufficient to show that by contacting several subject matter experts and specialists in the ISS Program Office, the Astromaterials Research and Exploration Sciences Office, and the Export Control Administrator's Office to perform searches and review documents, NASA made a good faith effort to search for the requested documents, using search methods "reasonably calculated to discover the requested documents." See Grand Cent. P'ship, 166 F.3d at 489.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted. Plaintiff's complaint is dismissed in its entirety. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

/S/
———————————
Allyne R. Ross
United States District Judge

Dated: January 14, 2010
      Brooklyn, New York

SERVICE LIST:

Pro Se Plaintiff
Barry Kaminsky
2652 Cropsey Avenue
Apt. 12-F
Brooklyn, NY 11214


U.S. Attorney's Office for Defendant
David Michael Eskew, Esq.
United States Attorney's Office
Eastern District Of New York
271 Cadman Plaza East
Brooklyn, NY 11201



cc:		Magistrate Judge Lois Bloom